**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

_____
|
**JOSE M. RAMOS-VAZQUEZ,**                  :
            **Plaintiff,**                         :
      **v.**                                     :      **CIVIL NO. 09-00364**
                                               :
**PRIMECARE MEDICAL, INC., BERKS**           :
**COUNTY, ENOS MARTIN, M.D., VICTORIA**      :
**GESSNER, M.D., and GEORGE WAGNER,**        :
            **Defendants.**                        :
_____  :


**MEMORANDUM OPINION AND ORDER**

**RUFE, J.**                                                      **September 30, 2010**

        Plaintiff Jose Ramos-Vazquez brings the instant action against defendants Berks County,

PrimeCare Medical, Inc. ("PrimeCare"), a privately owned health care provider responsible for

providing on-site health care services to inmates at Berks County Prison ("BCP"), two doctors,

and the Prison Warden, alleging cruel and unusual punishment in violation of the Eighth

Amendment of the United States Constitution, made applicable to the States by the Fourteenth

Amendment, and/or violations of his Due Process rights secured by the Fourteenth Amendment,

pursuant to 42 U.S.C. § 1983.  Plaintiff's claims arise out of the medical treatment he received

during his incarceration at Berks County Prison.   Now before the Court are Defendants' three

Motions to Dismiss[1] and Plaintiff's responses thereto.[2]

_____

        [1]Doc. Nos. 28, 30 & 34.

        [2]Doc. Nos. 36-38.

1

## I. FACTUAL AND PROCEDURAL BACKGROUND

Plaintiff Ramos-Vazquez commenced this action *pro se* on February 18, 2009, naming

Prison Warden George Wagner ("Warden Wagner") and PrimeCare employees Dr. Enos Martin

and Dr. Victoria Gessner as defendants in his initial Complaint.[3]  In March of 2009, all three

defendants moved to dismiss the complaint.  In response, Plaintiff moved for appointment of

counsel; the Court granted that motion and denied the motions to dismiss without prejudice.  On

February 3, 2010, through his court-appointed counsel, Plaintiff filed an Amended Complaint in

which he named PrimeCare and Berks County as additional defendants.[4]  PrimeCare, Dr. Martin

and Dr. Gessner (collectively, the "Medical Defendants") jointly moved to dismiss the Amended

Complaint pursuant to Fed. R. Civ. P. 12(b)(6); Warden Wagner and Berks County filed separate

but similar motions to dismiss.[5]  The underlying factual allegations are identical as to all three

sets of defendants, and as the claims against each defendant are interconnected and often

dependent on the claims against other defendants, this opinion addresses all three motions.

Plaintiff's claims arise out of medical treatment he received while he was incarcerated at

Berks County Prison in Pennsylvania from approximately February 1, 2008 to April 8, 2008.

Plaintiff alleges that, for many years, he has been diagnosed with and treated for serious mental

---

[3] Doc. No. 5.

[4] Doc. No. 24.

[5] Hereinafter, these shall be referred to as the "Medical Motion," the "Wagner Motion," and the "County Motion." Plaintiff filed three separate memoranda in opposition to these motions.

illnesses, including schizophrenia, bipolar disorder, and schizoaffective disorder.[6]  As a result of

his underlying disorders, he has experienced symptoms including depression, anxiety, paranoia,

insomnia, aggression, hypomania, hallucinations, and suicidal ideation.[7]  During 2006 and 2007,

Plaintiff received treatment for these illnesses at a clinic in Reading, Pennsylvania, where he was

prescribed several psychotropic medications, including an antipsychotic for his schizophrenia.

With this medication, he alleges, his symptoms improved.[8]  In 2007, Plaintiff moved to Florida,

where he sought further treatment for his mental disorders, and was prescribed an antipsychotic,

an antidepressant, and various other medications.[9]

     While in Florida, Plaintiff missed a scheduled court appearance related to a Pennsylvania

burglary charge, and, in January 2008, was apprehended in Florida by a bail bondsman.[10]

Plaintiff was briefly incarcerated in Florida, before being transferred to BCP on February 1,

2008.  Plaintiff alleges that he was in possession of his prescription medications during his

Florida imprisonment and transfer to Pennsylvania, but that he was not permitted to keep these

medications after his arrival at BCP.[11]  Plaintiff was "quarantined" during the first ten days of his

incarceration at BCP, during which time he was evaluated by a nurse, but not a doctor.[12]  Plaintiff

---

[6] Am. Compl. ¶¶ 10, 16.

[7] Id. ¶ 11.

[8] Id. ¶ 12.

[9] Id. ¶ 13.

[10] Id. ¶ 14.

[11] Id. ¶¶ 15, 18.

[12] Id. ¶ 17.

was prescribed an antidepressant on February 2, 2008, and had his first appointment with Dr. Martin, a psychiatrist employed by PrimeCare, on February 18th.[13] Plaintiff alleges that while Dr. Martin noted that Plaintiff was suffering from a "mood disorder," he did not note any other diagnosis, and refused to prescribe an antipsychotic.[14] Instead, Dr. Martin prescribed only an antidepressant medication,[15] and on February 26th, yet another antidepressant.[16] Feeling that his mental health symptoms had not only failed to improve, but had, in fact, worsened under Dr. Martin's treatment, Plaintiff filled out an "Inmate Communication Form" directed to Warden Wagner on February 29th, in which he requested "different and/or additional medical treatment." He did not receive a response to this request.[17] On March 4th, Plaintiff submitted one of several "Sick Call Requests," complaining about his current medication, and was told by BCP personnel that he was scheduled for a follow-up appointment with Dr. Martin; this second and final appointment with Dr. Martin took place on or about March 18th.[18] Plaintiff states that at this appointment he told Dr. Martin that he was continuing to experience symptoms of psychosis, including insomnia, hyperactivity, auditory hallucinations, nightmares, a desire to hurt himself or

---

[13] Id. ¶¶ 19-20, 22.

[14] Id. ¶ 22.

[15] Plaintiff and Defendants appear to disagree—and it is not clear from the allegations in the Complaint—whether Plaintiff was prescribed three different antidepressants, or whether the second prescription was merely an increased dose of the first antidepressant.

[16] Id. ¶¶ 23-24.

[17] Id. ¶ 25.

[18] Id. ¶¶ 26-27.

others, "feeling out of place," and the sensation of "'having his head in the air'."[19] Plaintiff alleges that, as before, he told Dr. Martin that the prescribed antidepressants were not alleviating these symptoms and requested that Dr. Martin prescribe the antipsychotic that Plaintiff felt had been effective for him in the past. Again, Dr. Martin did not prescribe an antipsychotic, but increased the dose of antidepressants.[20]

In addition to his appointments with Dr. Martin, Plaintiff was seen by Dr. Gessner for the treatment of chronic back and neck pain during his incarceration at BCP.[21] Plaintiff alleges that he also told Dr. Gessner, a PrimeCare supervisor, that he wished to have more frequent appointments with Dr. Martin, that his current antidepressant medication was not working, and that he wished to take an antipsychotic, which had been effective for him in the past.[22] Dr. Gessner prescribed a pain reliever for Plaintiff's back and neck pain, but did not assist Plaintiff in obtaining additional appointments with a psychiatrist nor did she prescribe any antipsychotic medication.[23]

On or about April 8, 2008, Plaintiff was released from BCP with three days worth of the antidepressants he had been prescribed by Dr. Martin.[24] Plaintiff alleges that, because his symptoms of mental illness had worsened during his incarceration and were severe at the time of

---

[19] Id. ¶ 27.

[20] Id. ¶ 28.

[21] Id. ¶ 29.

[22] Id. ¶¶ 29-30.

[23] Id. ¶¶ 30-31.

[24] Id. ¶¶ 34-36.

his release, he made multiple attempts to obtain additional and/or more effective medication by contacting his probation officer, a non-profit organization that provides mental health services in the Reading area, the police, and emergency medical services. None were able to provide him with immediate psychiatric care or medication.[25]

Within ten days of his release from custody, on April 18, 2008, having been unable to secure effective medication or other psychiatric care, Plaintiff alleges that he suffered a severe psychotic break, during which he shot himself in both feet, drove a nail through each hand, punched his mother and pregnant sister-in-law and threatened to kill his mother.[26] In order to subdue Plaintiff and take him into custody after this assault, police found it necessary to shoot him in the abdomen.[27] Plaintiff was taken to Reading Hospital, where in addition to treating his gunshot wounds, doctors immediately diagnosed him as a paranoid schizophrenic and prescribed an antipsychotic, which he received throughout his hospital stay.[28]

Plaintiff was released from the Hospital into the custody of BCP on April 23, 2008, and remained there until December of 2009.[29] Within three days of his return to BCP, Plaintiff saw a

---

[25] Id. ¶¶ 37-38.

[26] Id. ¶ 39.

[27] Id.

[28] Id. ¶¶ 40-41. Specifically, Plaintiff alleges that a doctor at Reading Hospital stated: "'[Plaintiff] endorses auditory hallucinations and obviously is attending to internal stimuli. He endorses delusions of grandeur and paranoia. . . . This is a patient who reports a long history of mental illness who shows obvious signs of primary psychotic disorder. I would not be surprised if there were an underlying manic component as well . . . . He clearly needs an antipsychotic.'" Am. Compl. ¶ 41. This hearsay report would not be admissible at trial, nor would undocumented statements be viewed by the Court as reliable; at the pleading stage, however, even though the Court cannot attribute this statement to a particular medical professional, it is nonetheless a factual allegation sufficient to support Plaintiff's claim.

[29] Am. Compl. ¶ 42.

psychiatrist and was prescribed two antipsychotics, several different antidepressants, and/or sedatives.[30]  During his second incarceration at BCP, Plaintiff states that he received appropriate medical treatment and that his symptoms improved.[31]

Plaintiff alleges that the actions of Dr. Martin, Dr. Gessner and Warden Wagner during his first BCP incarceration, pursuant to the policies, procedures and/or customs of PrimeCare and Berks County, constituted deliberate indifference to Plaintiff's serious medical needs and were the proximate cause of his unnecessary and avoidable physical injuries and mental and emotional anguish.[32]  Specifically, Plaintiff alleges that Dr. Martin and Dr. Gessner were repeatedly informed by Plaintiff of his serious mental illness and of his need for the medication which had been effective in treating it, knew that his symptoms were getting worse throughout his incarceration, refused to prescribe an antipsychotic, and may in fact have exacerbated Plaintiff's symptoms by prescribing an inappropriate combination of antidepressants and pain relievers.[33]  Plaintiff further alleges that, through the Inmate Communication Form he filed, Warden Wagner knew of Plaintiff's serious medical needs and the problems with his treatment, but refused to address them himself, and/or acquiesced in Dr. Martin's and Dr. Gessner's deliberate indifference.[34]  With respect to the quality and extent of the medical care provided to Plaintiff during his incarceration at BCP, Plaintiff alleges that Defendants Martin, Gessner, Wagner and

---

[30] Id. ¶¶ 43-44.

[31] Id. ¶ 45.

[32] Id. ¶¶ 48-50, 53-55.

[33] Id. ¶¶ 16, 18-19, 21-24, 26-31, 33.

[34] Id. ¶ 25.

other BCP personnel acted at all times pursuant to the policies, procedures and/or customs of Defendants Berks County and PrimeCare, such that in establishing those policies and procedures the County and PrimeCare demonstrated deliberate indifference to Plaintiff's serious medical needs.[35]  Furthermore, Plaintiff alleges that all Defendants acted under color of state law in providing medical services or treatment to inmates at BCP or overseeing the provision of that treatment.[36]  In sum, Plaintiff alleges that all Defendants' individual actions and policies, procedures or customs constituted cruel and unusual punishment in violation of the Eighth Amendment, made applicable to the states via the Fourteenth Amendment, and/or in violation of Plaintiff's right to due process under the Fourteenth Amendment.

## II.    STANDARD OF REVIEW

A complaint may be dismissed for failure to state a claim upon which relief can be granted pursuant to Federal Rule of Civil Procedure 12(b)(6) if the plaintiff has not presented "'enough fact[s] to raise a reasonable expectation that discovery will reveal evidence' of [a] necessary element"[37] of that claim.  In evaluating a challenged complaint, a court must "accept all factual allegations as true, construe the complaint in the light most favorable to the plaintiff, and determine, whether under any reasonable reading of the complaint, the plaintiff may be entitled

---

[35] Id. ¶¶ 17-20, 26, 32, 35.

[36] Id. ¶¶ 7, 47, 52.

[37] Phillips v. County of Allegheny, 515 F.3d 224, 234 (3d Cir. 2008) (citing Bell Atl. Corp. v. Twombly, 550 U.S. 544, 556 (2007)) (alteration in original). At the pleading stage, the court does not determine whether the non-moving party will prevail, but whether it will be permitted to seek evidence in support of the claims in the complaint. See Twombly, 550 U.S. at 556-59.

to relief."[38]  The court need not, however, accept as true a complaint's "bald assertions" or "legal conclusions."[39]

The Supreme Court recently abrogated its longstanding decision in Conley v. Gibson,[40] which had held that a complaint might be dismissed only if "it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief."[41]  In Twombly, the Court retired this "no set of facts" language in favor of a pleading standard under which plaintiffs are required to "nudge[] their claims across the line from conceivable to plausible."[42]  This exercise "requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do."[43]  A well-pled complaint must contain factual allegations sufficient "to raise a right to relief above the speculative level,"[44] and "provide not only 'fair notice,' but also the 'grounds' on which the claim rests."[45]  Therefore a court may dismiss a complaint if it fails to contain "either direct or inferential allegations respecting all the

---

[38] Id. at 233; *see also* Nami v. Fauver, 82 F.3d 63, 65 (3d Cir. 1996) (at pleading stage, court must "accept as true the factual allegations in the complaint and all reasonable inferences that can be drawn therefrom").

[39] In Re Burlington Coat Factory Sec. Litig., 114 F.3d 1410, 1429-30 (3d Cir. 1997).

[40] 355 U.S. 41 (1957).

[41] Id. at 45-46.

[42] Bell Atl. Corp. v. Twombly, 550 U.S. 544, 570 (2007).

[43] Twombly, 550 U.S. at 555.

[44] Id.; *see also* Phillips, 515 F.3d at 234.

[45] Phillips, 515 F.3d at 232.

material elements necessary to sustain recovery under some viable legal theory."[46]  In <u>Ashcroft v. Iqbal</u>,[47] the Court clarified and reinforced the pleading standard articulated in <u>Twombly</u>, holding that, "where the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged—but it has not 'show[n]'—'that the pleader is entitled to relief,'"[48] and the complaint should be dismissed.[49]

## III.    DISCUSSION

Before moving to an analysis of Defendants' Motions, it must first be noted that at the time relevant to the claims at issue in this matter, the Amended Complaint does not specify whether Plaintiff was a convicted prisoner, or a detainee awaiting trial.  It appears that Plaintiff was held pretrial on a warrant from Florida related to a Pennsylvania burglary charge,[50] but the

---

[46] <u>Twombly</u>, 550 U.S. at 562 (citing <u>Car Carriers v. Ford Motor Co.</u>, 745 F.2d 1101, 1106 (7th Cir. 1984)).

[47] 129 S.Ct. 1937, 1950 (2009).

[48] <u>Iqbal</u>, 129 S.Ct. at 1950 (citing Fed. R. Civ. P. 8(a)(2)).

[49] In evaluating those factual allegations, "a court should assume their veracity and then determine whether they plausibly give rise to an entitlement to relief." Id. at 1949-50 (cautioning that "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements do not suffice," nor is a court "bound to accept as true a legal conclusion couched as a factual allegation").  The Third Circuit has summarized the process as follows: "[A]fter <u>Iqbal</u>, when presented with a motion to dismiss for failure to state a claim, district courts should conduct a two-part analysis. First, the factual and legal elements of a claim should be separated.  The District Court must accept all of the complaint's well-pleaded facts as true, but may disregard any legal conclusions. Second, a District Court must then determine whether the facts alleged in the complaint are sufficient to show that plaintiff has a 'plausible claim for relief.' In other words, a complaint must do more than allege the plaintiff's entitlement to relief. A complaint has to 'show' such an entitlement with its facts." <u>Fowler v. UPMC Shadyside</u>, 578 F.3d 203, 210-11 (3d Cir. 2009) (internal citations omitted).

[50] Am. Compl. ¶¶ 14-15.

fact that Plaintiff was assigned a probation officer after his release from BCP[51] suggests he was a convicted prisoner. The Eighth Amendment prohibition against cruel and unusual punishment is inapplicable to pretrial detainees, who are instead protected by the due process rights secured by the Fourteenth Amendment.[52] Here, Plaintiff has alleged identical facts in support of his claims that Defendants' actions or policies constituted "cruel and unusual punishment in violation of the Eighth Amendment of the United States Constitution, made applicable to the States by the Fourteenth Amendment . . . , and/or constituted a violation of [his] Due Process rights secured by the Fourteenth Amendment . . . ."[53] Because "the Supreme Court has concluded that the Fourteenth Amendment affords pretrial detainees protections 'at least as great as the Eighth Amendment protections available to a convicted prisoner,' without deciding whether the Fourteenth Amendment provides greater protections,"[54] Plaintiff's status as a pretrial detainee or convicted prisoner makes no material difference to the Court's analysis of his allegations. The Third Circuit has further stated that it has found "no reason to apply a different standard than that set forth in Estelle [v. Gamble] (pertaining to prisoners' claims of inadequate medical care under the Eighth Amendment) when evaluating whether a claim for inadequate medical care by a pretrial detainee is sufficient under the Fourteenth Amendment,"[55] and both parties have used the

---

[51] Id. ¶ 37.

[52] See Bell v. Wolfish, 441 U.S. 520, 531 (1979); see also City of Revere v. Massachusetts Gen. Hosp., 463 U.S. 239, 244 (1983)).

[53] Am. Compl. ¶¶ 49, 54.

[54] Natale v. Camden County Corr. Facility, 318 F.3d 575, 581 (3d Cir. 2003) (citing City of Revere, 463 U.S. at 244).

[55] Id. (citing 429 U.S. 97, 103-04 (1976)); see also Boring v. Kozakiewicz, 833 F.2d 468, 472 (3d Cir. 1987); Inmates of Allegheny County Jail v. Pierce, 612 F.2d 754, 762 (3d Cir. 1979).

<u>Estelle</u> standard in arguing these motions. At the pleading stage, therefore, it is not fatal to the Amended Complaint that Plaintiff's status is unclear.

### A.    Motion to Dismiss by the Medical Defendants

#### 1.    Medical Indifference

"To establish a claim under 42 U.S.C. § 1983, a plaintiff must demonstrate a violation of a right protected by the Constitution . . . committed by a person acting under color of state law."[56] It is well established that private entities that contract with municipalities to provide services to prison inmates, as well as employees of those entities, are acting "under color of state law,"[57] and the Medical Defendants do not dispute the allegation that they were acting under color of state law.

The Supreme Court has declared that, in accordance with the "broad and idealistic concepts of dignity, civilized standards, humanity, and decency"[58] encompassed in the Eighth Amendment's prohibition against cruel and unusual punishment, the government is obliged "to provide medical care for those whom it is punishing by incarceration."[59] In part, this obligation

---

[56] *See* <u>Natale</u>, 318 F.3d at 580-81.

[57] *See* <u>West v. Atkins</u>, 487 U.S. 42, 53-58 (1988) (physician under contract to provide medical services at prison acted under color of state law) ; *see also* <u>McCullum v. City of Phila.</u>, 1999 U.S. Dist. LEXIS 10423, **6-10 (E.D. Pa. July 13, 1999) (private companies who contract with prisons act under color of state law for purposes of § 1983); <u>Morgan-Mapp v. George W. Hill Corr. Facility,</u> 2008 U.S. Dist. LEXIS 69434,**46-47 (E.D. Pa. Sept. 12, 2008) (same).

[58] <u>Estelle</u>, 429 U.S. at 102 (quoting <u>Jackson v. Bishop</u>, 404 F.2d 571, 579 (8th Cir. 1968)) (internal citations omitted).

[59] <u>Id</u>. at 103.

arises due to a prisoner's inability to access medical care on his or her own,[60] but more importantly, denial of proper medical care may in some instances lead to "pain and suffering which no one suggests would serve any penological purpose."[61] Therefore, the Court concluded that "deliberate indifference to serious medical needs of prisoners constitutes the 'unnecessary and wanton infliction of pain' proscribed by the Eighth Amendment. This is true whether the indifference is manifested by prison doctors in their response to the prisoner's needs or by prison guards in intentionally denying or delaying access to medical care . . . . Regardless of how evidenced, deliberate indifference to a prisoner's serious illness or injury states a cause of action under § 1983."[62]

The Supreme Court was careful to caution, however, that "medical malpractice does not become a constitutional violation merely because the victim is a prisoner."[63] In other words, an inadvertent failure to provide adequate medical care, or negligence in diagnosing or treating a medical condition cannot be said to constitute the kind of "unnecessary and wanton infliction of pain . . . repugnant to the conscience of mankind"[64] that is proscribed by the Eighth Amendment. Therefore, "[i]n order to state a cognizable claim, a prisoner must allege acts or omissions

---

[60] See id. at 103-104 & n.9 (noting the common law view that "it is but just that the public be required to care for the prisoner, who cannot by reason of the deprivation of his liberty, care for himself") (internal citations omitted) (alteration in original) (quoting Spicer v. Williamson, 191 N.C. 487, 490 (1926)).

[61] Id.

[62] Id. at 104-05 (citing Gregg v. Georgia, 428 U.S. 153, 173 (1976)) (internal punctuation omitted). Although most "deliberate indifference" claims address the treatment of a plaintiff's physical ills, psychological and psychiatric care is held to the same standards. See, e.g., Inmates of Allegheny County Jail v. Pierce, 612 F.2d 754, 763 (3d Cir. 1979).

[63] Inmates of Allegheny, 612 F.2d at 106.

[64] Estelle, 429 U.S. at 105-06 (internal punctuation omitted).

sufficiently harmful to evidence deliberate indifference to serious medical needs."[65]

In evaluating a plaintiff's claims at summary judgment in <u>Natale</u>, the Third Circuit articulated the <u>Estelle</u> standard as a two-pronged test, for which "evidence must show (i) a serious medical need, and (ii) acts or omissions by prison officials that indicate deliberate indifference to that need."[66]  With regard to the first prong, a medical need is "serious" if "it is one that has been diagnosed by a physician as requiring treatment or one that is so obvious that a lay person would easily recognize the necessity for a doctor's attention . . . . The seriousness of an inmate's medical need may also be determined by reference to the effect of denying the particular treatment."[67]  Plaintiff has plainly alleged a serious medical need, and Defendants do not dispute that allegation.

Whether or not Plaintiff has adequately alleged the second prong of the <u>Estelle</u> test—*i.e.*, acts or omissions that demonstrate deliberate indifference—is a closer question.  Deliberate indifference is a relatively subjective standard of liability, "lying somewhere between the poles of negligence at one end and purpose or knowledge at the other" and often equated with recklessness as that term is defined in criminal law.[68]  In <u>Farmer v. Brennan</u>, the Supreme Court adopted a "subjective" test for deliberate indifference, holding that an individual "prison official cannot be found liable under the Eighth Amendment . . . unless the official knows of and disregards an excessive risk to inmate health or safety; the official must both be aware of the

---

[65] <u>Id</u>. at 106.

[66] <u>Natale</u>, 318 F.3d at 582 (citing <u>Rouse v. Plantier</u>, 182 F.3d 192, 197 (3d Cir. 1999)).

[67] <u>Monmouth County Corr. Inst. Inmates v. Lanzaro</u>, 834 F.2d 326, 347 (3d Cir. 1987) (internal citations and punctuation omitted).

[68] <u>Farmer v. Brennan</u>, 511 U.S. 825, 836; *see also* <u>Natale</u>, 318 F.3d at 582 (quoting <u>Nicini v. Morra</u>, 212 F.3d 798, 811 (3d Cir. 2000)).

facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference."[69]  The test requires more proof of state of mind than that required to find a government entity culpable under Canton v. Harris;[70] however, a "claimant need not show that a prison official acted or failed to act believing that harm actually would befall an inmate; it is enough that the official acted or failed to act despite his knowledge of a substantial risk of serious harm."[71]  "Whether a prison official had the requisite knowledge of a substantial risk is a question of fact subject to demonstration in the usual ways, including inference from circumstantial evidence . . . and a factfinder may conclude that a prison official knew of a substantial risk from the very fact that risk was obvious."[72]  Furthermore, "[w]hile the obviousness of a risk is not conclusive and a prison official may show that the obvious escaped him . . . he would not escape liability if the evidence showed that he merely refused to verify underlying facts that he strongly suspected to be true, or declined to confirm inferences of risk that he strongly suspected to exist . . . ."[73]

In establishing that a defendant acted with deliberate indifference, courts have consistently held that "mere disagreement as to the proper medical treatment"[74] or allegations

---

[69] Farmer, 511 U.S. at 837; *cf.* Morgan-Mapp, 2008 U.S. Dist. LEXIS 69434, *41 (E.D. Pa. Sept. 12, 2008) ("Therefore, the standard governing pretrial detainees must be somewhat less than the high standard articulated in Farmer.")

[70] 489 U.S. 378 (1989) (adopting an "objective" test for deliberate indifference, under which a plaintiff need only show that the risk was obvious and a reasonable observer would have noticed it).  As the Court noted in Farmer, "considerable conceptual difficulty would attend any search for the subjective state of mind of a governmental entity, as distinct from that of a government official." 511 U.S. at 841.

[71] Farmer, 511 U.S. at 841-42.

[72] Id. at 842.

[73] Id. at 843 n.8.

[74] Lanzaro, 834 F.2d at 346.

that sound more appropriately in a state tort claim for medical malpractice do not support a § 1983 claim.[75]  The Estelle test "affords considerable latitude to prison medical authorities in the diagnosis and treatment of the medical problems of inmate patients."[76]  Consequently, where a prisoner has received medical care and only the adequacy of the treatment is disputed, courts are often reluctant to "second guess" professional medical judgment and constitutionalize malpractice claims.[77]  It is therefore very difficult for a prisoner ultimately to prevail on such claims.  Nonetheless, the Third Circuit has delineated a number of situations that do demonstrate deliberate indifference:  for example, "[w]here prison authorities deny reasonable requests for medical treatment . . . and such denial exposes the inmate to undue suffering or the threat of tangible residual injury;" where "knowledge of the need for medical care is accompanied by the intentional refusal to provide that care;" where short of absolute denial, "necessary medical treatment is delayed for non-medical reasons;" and where "prison officials erect arbitrary and burdensome procedures that result in interminable delays and outright denials of medical care to suffering inmates."[78]

Defendants here, relying heavily on cases that suggest or hold that deliberate indifference is not found when a plaintiff has received some level of medical care,[79] argue that Plaintiff's

---

[75] See id.

[76] Inmates of Allegheny, 612 F.2d at 762 (remanding for determination whether level of psychiatric care met constitutional requirement for reasonable access to qualified medical personnel).

[77] See id. (citing Bowring v. Godwin, 551 F.2d 44, 48 (4th Cir. 1977)); see also, e.g., United States v. Fayette County, 599 F.2d 573, 575 n.2 (3d Cir. 1979);  Clark v. Doe, 2000 U.S. Dist. LEXIS 14999, **8-9 (E.D. Pa. Oct. 13, 2000).

[78] Lanzaro, 834 F.2d at 346-47 (collecting cases) (internal punctuation, alterations, and citations omitted).

[79] See Defs.' Mem. in Supp. of Wagner Mot. at 6.

allegations show only his disagreement with the medical treatment provided. While it is clear on the face of the Amended Complaint that Plaintiff did receive medical care while incarcerated, in the form of two visits to a psychiatrist, several visits to another doctor, and a number of prescription medications, and while it is also true that Plaintiff disagreed with the treatment he received, the Court finds that Plaintiff has alleged more than mere disagreement. Plaintiff has alleged that his previously effective antipsychotic medication was confiscated on his arrival at BCP and, despite his repeated requests for that or similar medication, and his repeated reports to Drs. Martin and Gessner that his psychotic symptoms had returned and were increasing, the doctors refused to prescribe an antipsychotic and provided no medical explanation for that refusal. Moreover, Plaintiff alleges that the antidepressants which *were* provided had no positive effect on his symptoms at all; rather, they seemed to have detrimental effects, which Plaintiff duly reported, to no avail. He alleges that his initial visit to a psychiatrist was unreasonably delayed, and that the single follow-up visit he was granted was both delayed and inadequate to treat his psychiatric issues. Additionally, Plaintiff alleges that Dr. Gessner prescribed pain medication contraindicated by the antidepressants that Dr. Gessner knew Plaintiff was taking. This combination of drugs, he believes and alleges, further exacerbated his condition, causing him to suffer psychotic symptoms while incarcerated and finally resulting in his April 18, 2008 psychotic break, assault and physical injuries to himself and others.[80] Inasmuch as Plaintiff has alleged that the medical treatment he received was so inadequate as to be utterly ineffective, and, more importantly, because Plaintiff has alleged that the treatment actually had *negative* effects on

---

[80] Although it is tempting to make a *res ipsa* argument that the events on and following April 18th answer the "deliberate indifference" question, just as the seriousness of an inmate's medical need may be determined by reference to the effect of denying the particular treatment, *see* Lanzaro, 834 F.2d at 347, the Court does not rely on those events in finding that Plaintiff's allegations are adequate to survive a motion to dismiss.

his serious medical condition, the Court finds that Plaintiff's allegations state a plausible claim of deliberate indifference on the part of Drs. Martin and Gessner.


### 2.      Proximity and Causation

Next, the Medical Defendants contend that, even assuming that Plaintiff has properly alleged deliberate indifference, the time that passed between Plaintiff's last interaction with the Medical Defendants and his physical injuries, in conjunction with Plaintiff's failed attempts to obtain medical care from alternative sources in the interim, is enough to sever the Medical Defendants' actions (or inactions) from the harm Plaintiff suffered on April 18th.  Defendants cite Hazel v. Swartz[81] for the proposition that § 1983 requires a "close causal connection" between a defendant's conduct and the alleged injury for liability to attach,[82] while Plaintiff argues that the tort concept of proximate cause is the appropriate standard for this element of a § 1983 claim.  But "close causal connection" is simply an alternative way of articulating a proximate cause requirement.  In Hedges v. Musco, the Third Circuit held that "[i]t is axiomatic that [a] § 1983 action, like its state tort analogs, employs the principles of proximate causation,"[83] and explained that "'[t]o establish the necessary causation, a plaintiff must demonstrate a 'plausible nexus' or 'affirmative link' between the [defendant's action] and the specific

---

[81] 909 F. Supp. 261, 264 (M.D. Pa. 1995) (citing Martinez v. California, 444 U.S. 277, 285 (1980)).

[82] Medical Mot. ¶ 25.

[83] 204 F.3d 109, 121 (3d Cir. 2000) (quoting Townes v. City of New York, 176 F.3d 138, 146 (2d Cir. 1999)); see also Rivas v. City of Passaic, 365 F.3d 181, 193 (3d. Cir. 2004).

deprivation of constitutional rights at issue.'"[84] The parties' argument over "close connection" versus "proximate causation" debates a distinction without a meaningful difference.[85] The Court agrees with Plaintiff that proximate causation is the proper standard and holds that Plaintiff has properly alleged an affirmative link between his injuries and the Medical Defendants' actions.

First, the Court finds that the ten-day period between Plaintiff's release from BCP and the events of April 18th is not long enough to render Plaintiff's psychotic break indisputably "remote" from Defendants' medical treatment. Plaintiff's attempts to find other sources of medical treatment after his release do not relieve the Medical Defendants of their responsibility to provide Plaintiff with adequate medical care while he was incarcerated.[86] More importantly, Plaintiff alleges not that his April 18th injuries were the result of Defendants' failure to provide adequate medical care *after* his release, but that they were the direct and foreseeable result of Defendants' failure to provide antipsychotic medication during the two months of incarceration preceding his release. Finally, Defendants' argument ignores Plaintiff's well-pled allegations that he experienced distressing symptoms while incarcerated, when he was indisputably under Medical Defendants' care. Therefore, the Court holds that Plaintiff's allegations draw a

---

[84] Hedges, 204 F.3d at 121 (quoting Bielevicz v. Dubinon, 915 F.2d 845, 850 (3d Cir. 1990)). A court in this District recently applied the Hedges "affirmative link" standard using the language of Hazel. *See* Miller v. Beard 699 F. Supp.2d 697, 705 (E.D. Pa. 2010) ("[A] plaintiff must demonstrate a 'close causal connection' between his injury and a defendant's conduct. 'To establish the necessary causation, a plaintiff must demonstrate a[n] . . . affirmative link between the defendant's actions and the specific deprivation of constitutional rights at issue.'") (citing Hedges, 205 F.3d at 121).

[85] *See also* W. Page Keeton, et al., Prosser and Keeton on the Law of Torts § 30, 165 (5th ed. 1984) ("A reasonably close causal connection between the conduct and the resulting injury . . . is what is commonly known as 'legal cause,' or 'proximate cause'. . . .").

[86] Even if Defendants could show that one of the sources Plaintiff consulted had a duty to treat him, it is not at all clear that intervention during that ten-day period could have prevented Plaintiff's April 18th injuries.

reasonable connection between Defendants' actions and the physical and mental injuries he suffered both during and soon after his incarceration.

### 3. PrimeCare's Liability

It is well settled that a private corporate entity providing medical services to inmates cannot be held liable under § 1983 for constitutional violations committed by its employees under a theory of *respondeat superior* or vicarious liability.[87]  As with municipalities, a private entity like PrimeCare will be liable only if Plaintiff can provide evidence that the constitutional violation alleged was the result of the entity's policy, procedure or custom.[88]  At the motion to dismiss stage, therefore, a plaintiff must plausibly allege that such a policy or custom exists. Because the analysis of PrimeCare's liability under this standard is substantially the same as the analysis of the County's liability, the Court will address PrimeCare's liability below.[89]

### B. Motion to Dismiss by Berks County

### 1. Municipal Liability

Although a municipality cannot be held liable under § 1983 for the actions of their employees based solely on a theory of *respondeat superior*,[90] local governing bodies "can be

---

[87] *See* Natale, 318 F.3d at 583 (citing Monell v. New York City Dept. of Soc. Servs., 436 U.S. 658, 691 (1978)); *see also* Durmer v. O'Carroll, 991 F.2d 64, 69 n.14 (3d Cir. 1993) ("Respondeat superior is, of course, not an acceptable basis for liability under § 1983").

[88] *See* Natale, 318 F.3d at 583-84 (citing Bd. of County Comm'rs of Bryan County v. Brown, 520 U.S. 397, 404 (1997)).

[89] *See infra* Part III.B.

[90] *See* Bryan County, 520 U.S. at 403.

sued directly under § 1983 . . . where, as here, the action that is alleged to be unconstitutional implements or executes a policy statement, ordinance, regulation, or decision officially adopted and promulgated by that body's officers."[91]  In finding municipal liability, courts "have required a plaintiff seeking to impose liability on a municipality under § 1983 to identify a municipal 'policy' or 'custom' that caused the plaintiff's injury.  Locating a 'policy' ensures that a municipality is held liable only for those deprivations resulting from the decisions of its duly constituted legislative body or of those officials whose acts may fairly be said to be those of the municipality.  Similarly, an act performed pursuant to a 'custom' that has not been formally approved by an appropriate decisionmaker may fairly subject a municipality to liability on the theory that the relevant practice is so widespread as to have the force of law."[92]

"Not all state action rises to the level of custom or policy," but any number of situations exist in which acts of an employee may be attributed to a policy or custom of the governmental entity for whom the employee works, rendering the entity liable under § 1983.[93]  These include situations where the act at issue is simply an implementation of a policy promulgated by the entity,[94] where "no rule has been announced as policy but federal law has been violated by an act of the policymaker itself,"[95] or where a policymaker has not taken any affirmative action, but the need for action is "so obvious, and the inadequacy of existing practice so likely to result in the

---

[91] Monell, 436 U.S. at 690.

[92] Bryan County, 520 U.S. at 403-404 (internal citations omitted); *see also* Monell, 436 U.S. at 691; City of Canton, 489 U.S. at 379.

[93] *See* Natale, 318 F.3d at 584.

[94] *See* id.

[95] Id.(internal citation omitted) (quoting Bryan County, 520 U.S. at 417 (Souter, J., dissenting)).

violation of constitutional rights, that the policymaker can reasonably be said to have been deliberately indifferent to the need."[96]  For example, in <u>Natale</u>, the Third Circuit found that a reasonable jury could conclude that failing to establish a policy to address the immediate medication needs of inmates with serious medical conditions constituted deliberate indifference on the part of a prison health system.[97]

Defendants here contend that Amended Complaint must be dismissed as to Berks County and PrimeCare because Plaintiff fails to identify the policies, procedures or customs of which he complains; fails to distinguish which actions were taken pursuant to a policy and which were the result of a custom; and fails to distinguish between the policies and procedures of the County and the policies and procedures of PrimeCare.[98]  The Court finds, however, that these failures are not fatal at the pleading stage.  Plaintiff alleges that, pursuant to the policies, procedures and/or customs of Berks County or PrimeCare, his effective antipsychotic was confiscated and not replaced, he was prevented from seeing a doctor for at least the first ten days of his incarceration, he was prevented from seeing a psychiatrist until the eighteenth day of his incarceration, his follow-up appointment with the psychiatrist was delayed, on his release from BCP he was provided with insufficient and ineffective medication, and finally, that he was denied any antipsychotic medication throughout his incarceration.  Moreover, Plaintiff alleges that these actions were taken even though prison and PrimeCare personnel were aware that Plaintiff had

---

[96] <u>Id</u>. (internal citation omitted); *see also* <u>Berg v. County of Allegheny</u>, 219 F.3d 261, 276 (3d Cir. 2000) (holding that plaintiff must demonstrate that the municipal action was taken with deliberate indifference to its known or obvious consequences).

[97] *See* <u>Natale</u>, 318 F. 3d at 585 ("failure to establish such a policy is a 'particular[ly] glaring omission' in a program of medical care" (citing <u>Bryan County</u>, 520 U.S. at 410-11) (alteration in original)).

[98] County Mot. 7-8.

been diagnosed with schizoaffective disorder and was taking a prescribed antipsychotic until his arrival at BCP.[99]  Therefore, Plaintiff alleges, Defendants were aware or should have been aware that failure to treat Plaintiff's schizoaffective disorder could have serious negative consequences.[100]

The Court find these allegations sufficiently specific to survive a motion to dismiss.  The allegations are "conclusory" in the sense that it is reasonable for Plaintiff to conclude that the actions he complains of were undertaken pursuant to some policy, procedure or custom of at least one of the entities that controlled and implemented medical treatment at the prison.  At this stage, Plaintiff cannot be expected to specify and articulate which policy, procedure or custom resulted in these actions; nor should he be expected to know which entity formulated each policy.  Therefore, the Court holds that Plaintiff's allegations are sufficient to state a claim against the County and against PrimeCare.

### 2.        The County's Motion to Strike

In the alternative, the County asserts that paragraphs thirty-four to thirty-nine of the Amended Complaint, describing the events which took place after Plaintiff's release from BCP, should be stricken pursuant to Federal Rule of Civil Procedure 12(f) as immaterial and unduly prejudicial.[101]  Rule 12(f) does permit a court to strike from a pleading any "redundant,

---

[99] Am. Compl. ¶ 16.

[100] *See* id.

[101] Def.'s Mem. in Support of County Mot. at 11-12.

immaterial, impertinent, or scandalous matter,"[102] but motions to strike are disfavored.[103] In general, courts prefer not to "tamper with the pleadings"[104] and should deny a Rule 12(f) motion "unless the allegations have no possible relation to the controversy."[105] Because the Court finds that Plaintiff properly alleged an affirmative link between his injuries and the Medical Defendants' actions,[106] the Motion to Strike will be denied.

### C.     Motion to Dismiss by Warden Wagner

An individual defendant in a civil rights action "must have personal involvement in the alleged wrongs;" as with municipal and private entities, "liability cannot be predicated solely on the operation of *respondeat superior*."[107] Plaintiff must therefore allege that Warden Wagner was personally involved in the violation of his constitutional rights by Dr. Martin and Dr. Gessner. In Rode v. Dellarciprette, the Third Circuit held that "[p]ersonal involvement can be shown through allegations of personal direction or of actual knowledge [of] and acquiescence" in a subordinate's violation of a plaintiff's constitutional rights.[108] Courts have questioned whether

---

[102] Fed. R. Civ. P. 12(f).

[103] *See, e.g.*, Lyon Fin. Servs. v. Woodlake Imaging, LLC, 2005 U.S. Dist. LEXIS 2011, *26 (citing Lipsky v. Commonwealth United Corp., 551 F.2d 887, 893 (2d Cir. 1976)); Ciolli v. Iravani, 625 F. Supp. 2d 276, 283 (E.D. Pa. 2009).

[104] Lipsky, 551 F.2d at 893.

[105] Ciolli, 625 F. Supp. 2d at 283 (quoting McInerney v. Moyer Lumber & Hardware, 244 F. Supp. 2d 393, 402 (E.D. Pa. 2002)).
.

[106] *See supra* Part III.A.3.

[107] Rode v. Dellarciprette, 845 F.2d 1195, 1207-208 (3d Cir. 1988); *see also* Durmer, 991 F.2d at 69 n.14.

[108] Rode, 845 F.2d at 1207-08.

24

this standard still applies after the Supreme Court's recent decision in Ashcroft v. Iqbal, which rejected a theory of "supervisory liability" based on knowledge and acquiescence.[109]  The Third Circuit has recognized that Iqbal may have changed the requirements for alleging personal involvement,[110] but has not yet overruled the standard articulated in Rode.[111]  Whether or not the Rode standard survives Iqbal is immaterial to the Court's decision here, as Plaintiff's allegations fail under either set of requirements.

As to Warden Wagner, Plaintiff alleges only that, dissatisfied with his treatment by Dr. Martin, Plaintiff "filled out an 'Inmate Communication Form' directed to Defendant Wagner, in which [Plaintiff] requested different and/or additional treatment. Upon information and belief, Defendant Wagner was aware of . . . [the] Form and either acquiesced and/or took no action whatsoever to ensure that [Plaintiff] received different and/or additional medical treatment."[112]  It is plausible to infer from this allegation that Wagner knew that Plaintiff had serious medical needs (or that Plaintiff believed he had a serious medical needs), that Plaintiff was being treated by prison medical staff, including Dr. Martin, and that Plaintiff was highly dissatisfied with Dr.

---

[109] 129 S.Ct. 1937, 1949 (2009) ("[Respondent] argues that, under a theory of 'supervisory liability,' petitioners can be liable for knowledge and acquiescence in their subordinates' use of discriminatory criteria to make classification decisions among detainees. That is to say, respondent believes a supervisor's mere knowledge of his subordinate's discriminatory purpose amounts to the supervisor's violating the Constitution. We reject this argument. Respondent's conception of 'supervisory liability' is inconsistent with his accurate stipulation that petitioners may not be held accountable for the misdeeds of their agents.") (internal citations omitted).

[110] Bayer v. Monroe County Children & Youth Servs., 577 F.3d 186, 191 n.5 (3d Cir. 2009) (noting that in light of Iqbal, "it is uncertain whether proof of such personal knowledge, with nothing more, would provide a sufficient basis for holding [Defendant] liable with respect to plaintiffs' Fourteenth Amendment claims under § 1983").

[111] See Park v. Veasie, 2010 U.S. Dist. LEXIS 56627, **20-21 (M.D. Pa. June 9, 2010); Williams v. Lackawanna County Prison, 2010 U.S. Dist. LEXIS 36410, **15-18 (M.D. Pa. April 13, 2010); Womack v. Smith, 2009 U.S. Dist. LEXIS 120728, **15-17 (M.D. Pa. Dec. 29, 2009).

[112] Am. Compl. ¶ 25.

Martin's diagnosis and treatment. But it is not plausible to infer from this allegation alone that Wagner was deliberately indifferent with respect to Plaintiff's condition. The Third Circuit has held that "[i]f a prisoner is under the care of medical experts . . . a non-medical prison official will generally be justified in believing that the prisoner is in capable hands."[113] Accordingly, "absent a reason to believe (or actual knowledge) that prison doctors or their assistants are mistreating (or not treating) a prisoner, a non-medical prison official . . . will not be chargeable with the Eighth Amendment scienter requirement of deliberate indifference."[114] Because Wagner lacks the medical expertise required to evaluate Plaintiff's complaints, the Court finds that mere knowledge of Plaintiff's dissatisfaction with his medical treatment is not enough to suggest that Wagner knew the treatment was truly inadequate or detrimental.

## IV.    CONCLUSION

For the reasons stated and discussed in detail above, the Motion to Dismiss filed by Defendants PrimeCare Medical, Inc., Dr. Enos Martin and Dr. Victoria Gessner is denied; the Motion to Dismiss and Motion to Strike filed by Defendant Berks County is denied; and the Motion to Dismiss filed by Defendant Prison Warden George Wagner is granted.[115] An appropriate Order follows.

---

[113] Spruill v. Gillis, 372 F.3d 218, 236 (3d Cir. 2004); *see also* Durmer, 991 F.2d at 69 ("The only allegation against . . . defendants was that they failed to respond to letters [Plaintiff] sent to them explaining his predicament. Neither of these defendants, however, is a physician, and neither can be considered deliberately indifferent simply because they failed to respond directly to the medical complaints of a prisoner who was already being treated by the prison doctor.").

[114] Spruill, 372 F.3d at 236.

[115] Pursuant to Local Rule of Civil Procedure 7.1(f), Plaintiff requested oral argument on all three motions to dismiss. *See* Pl.'s Opp. to Medical Mot. at 2 n.1; Pl.'s Opp to County Mot. at 2 n.1; Pl.'s Opp to Wagner Mot. at 2 n.1. These requests are hereby dismissed as moot.